IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 7:25-cr-1143-TMC |
| | ) | |
| v. | ) | |
| | ) | |
| **LAWSON B. WATSON** | ) | |
| **AMOS DURHAM** | ) | |

### <u>Sentencing Memoranda of the United States</u>

Lawson Watson and Amos Durham, like Chuck Wright, violated the public's trust and used their positions in law enforcement to steal money they were not entitled to. For years, Watson drew a $57,000 salary and took benefits, insurance, a county vehicle, and a county phone while performing little or no work, all of which was enabled by his cousin, the elected sheriff. Durham enabled and participated in the embezzlement of money set aside for deputies and their families in need. Their schemes violated the public's trust. A Guidelines sentence for both would restore that trust.

### I. The Sentencing Guidelines

### a. The Guidelines framework

The federal sentencing guidelines ("U.S.S.G.") are promulgated by the United States Sentencing Commission pursuant to 28 U.S.C. § 994(a). They set forth an advisory sentencing scheme, *United States v. Booker*, 543 U.S. 220 (2005), that assists courts in identifying sentencing ranges that are "sufficient, but not greater than necessary" to serve the purposes of criminal sentencing. *See* 18 U.S.C. § 3553(a).

"A district court should begin by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 39 (2007). And in the Fourth Circuit, a "sentence within the

correctly calculated Guidelines range is presumptively reasonable." *United States v. Cureton*, 719 Fed. App'x. 190, 193–94 (2018), *citing United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014).

### b. The advisory Guidelines ranges

For Watson, the applicable Guidelines range is imprisonment of 10 to 16 months. ECF No. 82. That is based on a base offense level of seven for his wire fraud conspiracy conviction and ten levels added for a loss of $228,240 within the meaning of U.S.S.G. § 2B1.1(b)(1). Watson PSR ¶ 154, ECF No. 82. Because Watson accepted responsibility, three levels were removed, and because he is a zero-point offender, two levels were removed, PSR ¶ 161-63, leaving Watson with a total offense level of 12 and a criminal history category of I.

For Durham, the applicable Guidelines range is imprisonment of 6 to 12 months. ECF No. 83. That is based on a base offense level of six for his theft from programs receiving federal funds conviction and four levels added for a loss of $28,240 within the meaning of U.S.S.G. § 2B1.1(b)(1). Durham PSR ¶ 134, ECF No. 83. Two levels were added for theft from a charitable fund, and two more levels were added for Durham's abuse of a position of public trust to facilitate his scheme. Durham PSR ¶ 136, 138. Because Durham accepted responsibility, two levels were removed, and because he is a zero-point offender, two levels were removed, Durham PSR ¶ 141-43, leaving Durham with a total offense level of 10 and a criminal history category of I.

The defendants also face a term of supervised release of up to three years. Watson PSR ¶ 188, Durham PSR ¶ 172. Watson owes $349,885.22 in restitution for the no-show job scheme, and Durham owes $95,442.39 in restitution for the Benevolence Fund scheme. ECF No. 82, 83.

The Government respectfully submits that the § 3553(a) factors support a Guidelines sentence for both defendants.

**II.    The § 3553(a) Factors**

**a.    The nature and circumstances of the offense**

Watson and Durham were at the center of two significant fraud schemes led by Chuck Wright.   Their schemes are different than most that come before this Court because at their core were breaches of public trust and authority.   The defendants used the office of the sheriff to steal from the taxpayer and to embezzle from an fund set aside for deputies in need.   Both should face a Guidelines sentence.

<em>Durham's Benevolence Fund Scheme</em>

Wright embezzled from the Spartanburg County Chaplain Benevolence Fund, and Durham carried out that scheme and at times personally benefited from it.   Durham PSR ¶ 120.   From 2014 until his resignation, Durham was employed full-time as the SCSO chaplain.   Durham PSR ¶ 162.   One of his responsibilities was to administer the Benevolence Fund.   Durham PSR ¶ 55.

Donations to the fund were meant to be available to Spartanburg County deputies and their families when they suffered bereavement, financial difficulty, or line-of-duty trauma.   Durham PSR ¶ 44.   Instead, Wright used it to enrich himself to a point where it was a "chess game to move money around and attempt to keep sufficient funds" in the account.   Durham PSR ¶ 74.   Durham routinely withdrew cash from the fund for Wright to use.   "It was so much, I couldn't keep up," Durham explained.   Durham PSR ¶ 77.   On some days, Durham "felt as if all he was doing was going back and forth from the ATM or going to the bank for Wright."   *Id*.

Wright took more than $89,000 in cash from the fund.   Durham PSR ¶ 117.   All of those cash withdrawals came from Durham, despite Durham knowing there was a policy prohibiting cash withdrawals.   Durham PSR ¶ 106.   There is no accounting for how Wright spent that money, and spending put the account in a deficit.   Durham PSR ¶ 50.   More than 97% of what the Benevolence Fund brought in between 2022 and 2024 was spent, much of it by Wright.   Durham

PSR ¶ 112.   The fund's money was spent faster than the donations came in.   Durham PSR ¶ 50. Durham also wrote checks directly to Wright from the fund, including eleven checks totaling more than $5,000.   Durham PSR ¶ 118.   None of those checks to the sheriff were for deputies experiencing bereavement or loss.

One employee said it was common knowledge at the department that the fund was not being spent on what it was established for, and that she "could not sleep with a clear conscience" thinking of it.   Durham PSR ¶ 57.   Another shared that the fund was used to pay for Christmas parties at the office, if the party went over budget, and to buy trophies and awards.   Durham PSR ¶ 58.   Durham benefited personally from the theft: Durham used money from the fund to buy clothes for himself at Harrison's Outfitters & Workwear.   Durham PSR ¶ 57, 61, 65.

Wright also took money from the fund at least ten times to pay criminal informants. Durham PSR ¶ 95.   Wright never provided any documentation, receipts, or paperwork confirming the cash went to an informant.   *Id*.

Wright also likely used Benevolence Fund money to fund his addiction.   In one instance, Durham wrote, signed, and gave Wright a blank $1,000 check from the fund's account.   Durham PSR ¶ 71.   Wright then caused the check to be made out to Cooperator 1, who was a local street-level pill distributor.   Durham PSR ¶ 71.   When the check was deposited and $1,000 was withdrawn from the account, the bank teller wrote on the top of the check, "spoke with Sheriff Chuck Wright at 12:55 PM."   *Id*.   Cooperator 1 confirmed for the FBI that he sold Wright prescription pills, *Id*., and the check was written at a time Wright was suffering from addiction.

Wright also "kept emptying [] out" the department's petty cash.   Durham PSR ¶ 80.   And to repay the petty cash, Wright took from the Benevolence Fund.   Durham PSR ¶ 51.   To one employee, "power and greed" changed Wright.   Wright PSR ¶ 82.   And unfortunately, Durham facilitated Wright's worst instincts.   Taken together, Wright and Durham took more than

$95,442.39 from the fund.   Durham PSR ¶ 120.   This is despite Durham knowing that a committee was required to vote on who receives money from the fund.   Durham PSR ¶ 106.

The embezzlement caused real harm, including by preventing deputies from receiving support they needed.   When the wife of one deputy was in hospice with stage 4 cancer, the deputy's family approached the Benevolence Fund for financial assistance.   Durham PSR ¶ 60. They were turned away because there were no funds available.   *Id*.   And when a tree fell on another deputy's house, he was denied assistance because funds were not available.   Durham PSR ¶ 59.

To be clear, there was a significant power imbalance between Wright and Durham at the sheriff's office.   When confronted, Wright would remind employees that it was "his name on the building, not theirs."   Wright PSR ¶ 75.   Employees worked "at the pleasure" of the sheriff. Wright PSR ¶ 77, 156, 170.   It was Wright who led the Benevolence Fund scheme, but Durham knowingly helped him.

<u>*Watson's No Show Job Scheme*</u>

Watson took a no-show job in the Civil Division of the sheriff's department so he could take a $57,000 salary from the taxpayers that he did not earn.   Watson PSR ¶ 42-140, 181.

The scheme began to unravel after an anonymous tip was submitted to a county hotline. Watson PSR ¶ 56.   The tipster reported that Watson was Wright's cousin, and that on paper he was a code enforcement officer, but in truth he had not worked in years.   *Id*.   At most, Watson worked three times a year, the tipster reported.   *Id*.   The tip went on:

> This has been a waste of tax dollars and abuse by a public official for many years. This employee literally sits at home and collects a paycheck with no work being performed. None. The Sheriff thinks he is above the law. … The Sheriff knows L.B. has no job duties and collects a check every two weeks.

*Id*.   The county conducted an audit, which led to the investigation that brought Wright before this Court.   Watson PSR ¶ 57.

The wage theft scheme was confirmed by more than twenty witnesses interviewed by FBI and SLED.   "Everyone knew that Watson was not working," according to one supervisor. Watson PSR ¶ 86.   One employee estimated Watson did not work 95% of the time, and another last saw Watson at work in 2021, despite Watson being paid more than $50,000 a year.   Watson PSR ¶ 64, 71.   Another estimated that she saw Watson in the office two times in four years, and another described Watson as "a unicorn," given his ability to draw a check and not show up. Watson PSR ¶ 78, 98.   Even Wright acknowledged there was no documentation of Watson working.   Watson PSR ¶ 61.   Watson did not check his e-mail, did not know how to submit a timecard, and he allowed his passwords to expire.   Watson PSR ¶ 121.   At one point, Watson was not issued a computer because he did not check his county e-mail.   Watson PSR ¶ 86.

Watson did, however, use his county phone and county vehicle—for a different job, a paving and grading business that he owned and operated during business hours.   Watson PSR ¶ 122.   At times, he would have a county employee help him prepare paving quotes.   *Id*.   His county-issued vehicle was filled with dirt, consistent with it being used for his grading business. Watson PSR ¶ 101.   When one employee was asked what Watson did to earn a paycheck, she responded, "good question."   Watson PSR ¶ 97.   During the department's business hours, he was running a paving business.   *Id*.   "Employees laughed at Watson's employment with the SCSO." *Id*.

Watson was able to take the salary and benefits he did not earn because Wright, his cousin, enabled it.   Watson was referred to around the office as a "FOC," or "friend of Chuck."   Watson PSR ¶ 83.   "I work for Chuck," Watson would tell people, if asked what he did.   Watson PSR ¶ 109.   One supervisor was afraid he would be fired if he addressed Watson's job.   Watson PSR ¶

62.   "Watson would make you feel like he would have you fired or go directly to Wright" if you discussed Watson, one employee reported.   Watson PSR ¶ 107.   "Not honest," is how one employee described it, but she did not intervene because she "knew her place."   Watson PSR ¶ 121.   Another employee was instructed to not ask what Watson does.   Watson PSR ¶ 129. Several employees reminded agents they worked at the pleasure of the sheriff.   Wright PSR ¶ 77, 156, 170.

Watson knew he was not earning the money he took from the public, yet year after year he drew a salary, benefits, and enjoyed the use of a county vehicle and phone for his personal business. For that scheme, Wright and Watson now owe the county $349,885.22.   Watson PSR ¶ 141. Watson's sentence must reflect his and the sheriff's sustained theft from the taxpayer.

### *Victim Harm*

The victim impact statement from Spartanburg County demonstrates the harm that resulted. Wright's schemes "resulted in one of the most significant breaches of public trust, which is still being experienced by the County today."   ECF No. 57-1 at 1.

The county describes how Wright used his position as sheriff to funnel salary, insurance, and benefits to Watson, all at the taxpayer's expense and none of which Watson earned.   *Id*.   The Benevolence Fund scheme "depleted a resource that should have been available to support" "needful deputies [who] were forced to go without [the] helpful resources" set aside for them.   *Id*.

And when the sheriff resigned and was convicted, it undermined morale and it understandably caused the public to "question the competency and integrity" of their office.   *Id*. at 2.   These schemes caused significant harm to the county, its taxpayers, and the sheriff's department.   Their sentences must reflect that harm.

*Guideline Sentence*

When public officials use their office to commit a crime, the public understandably loses confidence in government. A Guideline sentence would serve to restore the public's trust. It would reflect the seriousness of the offense, afford adequate deterrence, provide a just punishment, and promote respect for the law. The nature and circumstances of the offense support a Guideline sentence.

**b. The history and characteristics of the defendant**

First, the Government acknowledges there are § 3553(a) factors that weigh in favor of both defendants.

As for Durham, he is 61 years old, he is a longtime member of the Woodruff community, he has a bachelor's degree, no prior criminal record, and he has been a pastor for 29 years. (But like law enforcement, his service as a pastor represents a position of trust and likely amplifies the impact of his conduct.) Durham PSR at 27-30. And since retaining counsel, Durham has made the right decisions. He has cooperated, accepted responsibility, pleaded guilty, and he has made arrangements to pay restitution prior to sentencing. The Government credits Durham for that but also respectfully submits that acceptance is reflected in his Guidelines.

As for Watson, he is 74 years old, a native of Spartanburg, he has no higher education, no prior criminal record, and he does have some modest health issues. Watson PSR at 31-33. He also has assets that put him in a position to meaningfully pay towards restitution. Watson PSR at 34-35.

But there are also history and characteristics that cut against the defendants. Their history in law enforcement hurts them; it does not help them. They used the power and authority of the elected sheriff to commit their offenses. They used a law enforcement office as the means of their criminal schemes. Their sentences must reflect that unique harm.

The defendants' history and characteristics support a Guidelines sentence.

### III.    Conclusion

The Government respectfully submits that the Court should impose a Guideline sentence.

These defendants broke the public's trust.   A Guideline sentence is necessary to restore that trust.

Respectfully Submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By: */s/ Elliott B. Daniels*
Elliott B. Daniels (Fed. ID # 11931)
Assistant United States Attorney
United States Attorney's Office
1441 Main Street, Suite 500
Columbia, SC 29201
Telephone 803-929-3000
Facsimile 803-256-0233
Elliott.Daniels@usdoj.gov

June 25, 2026
Columbia, South Carolina